UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLY ANNE LISI,            )
                            )
          Plaintiff,        )    CIVIL ACTION NO.
                            )    11-30163-DPW
v.                          )
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social      )
Security,                   )
                            )
          Defendant.        )
                            )

MEMORANDUM AND ORDER
May 18, 2012

Charly Anne Lisi challenges the final decision of the
Commissioner of the Social Security Administration (the
"Commissioner"), denying her Social Security Disability Insurance
benefits ("SSDI") and Supplemental Security Income benefits
("SSI").  Upon consideration of the entire record, which I find
provides substantial evidence for the denial, I will affirm the
Commissioner's decision.

**I.  BACKGROUND**

A.  Basic Facts

Lisi was thirty-two years old when she claims she became
disabled.[1]  At the time of her application, she was thirty-three.
She obtained her GED in 1995.  She had a number of short-term

---

[1]  There are numerous inconsistencies in the record, including
the alleged onset date of Lisi's disability.  In her SSDI
application, Lisi alleged an onset date of April 18, 2009.
However, in her SSI application, she alleged an onset date of
July 1, 2008.

jobs, such as a bank teller, deli clerk, hostess, and van driver, but primarily worked as a cashier and a school bus driver from 2006 to 2009.

B.   Medical History

 1.   *Physical Impairments*

 Lisi alleges that she is disabled as a result of back pain and colitis.

 On February 4, 2008, Dr. James Goodwin, Lisi's primary care physician, referred her to Dr. John Stagias, a gastroenterologist.  Dr. Stagias performed a consultation on February 4, during which Lisi complained of frequent diarrhea within fifteen to thirty minutes of having a meal, no matter what she ate.  She also complained of epigastric pain.

 On February 21, 2008, Lisi returned to Dr. Stagias, and again complained of epigastric pain and diarrhea.  Dr. Stagias thought she had H. Pylori bacteria and prescribed some medication for her.  In March, Lisi noted that her epigastric pain was better, but that she was still experiencing diarrhea and cramping after eating.  Dr. Stagias recommended that Lisi have a colonoscopy and an H. Pylori breath test.

 On April 4, 2008, Dr. Stagias performed Lisi's colonoscopy. The results were normal.  In May, 2008, Lisi reported that her epigastric pain continued to improve and she experienced it less frequently, but noted that she still had diarrhea after eating.

On May 30, 2008, Lisi had a esophagogastroduodenoscopy.  Dr. Stagias noted that Lisi had a normal esophagus, stomach, and duodenum, but visualized an EG junction.  On July 15, 2008, Lisi returned to Dr. Stagias, complaining that her diarrhea now was happening "almost instantly" after eating.  Dr. Stagias suggested that she take Metamucil.

On July 28, 2008, Lisi reported to Wing Memorial Hospital's Emergency Department complaining of back pain that began the week before.  The emergency care report from that visit notes that Lisi's only symptom was lower back pain; Lisi did not complain of spasms, nausea or vomiting, radiating pain, GU symptoms, fever, trauma, or a precipitating activity for the back pain.

On August 1, 2008, Lisi had an MRI of her lumbar spine.  During her intake, Lisi noted that she was having leg pain and weakness in her left foot.  After looking at the MRIs, Dr. Jonathan Kleefield, a radiologist, concluded that Lisi had moderately large left-sided L5-S1 disk herniation with caudal extrusion.  Dr. Kleefield recommended that Lisi consult with a surgeon.  Later reports indicate that Lisi did not consult with a neurosurgeon until September, then canceled the appointment and did not reschedule until 2009.

On April 3, 2009, Lisi went to see Dr. Paul Blomerth at Wing Memorial Hospital about her lower back pain.  Lisi noted that standing longer than twenty to thirty minutes increased her pain.

3

The pain was lessened if she lay on her left side.  She also described a sensation of numbness and pulling in her lower back, and occasional pain that radiated into her right thigh.  Dr. Blomerth noted that Lisi experienced tenderness over the L4 and L5 spinous process and bilateral sacroiliac joints, and that Lisi had 0 degrees of extension and 10 degrees of flexion with back pain, 30 degrees of left leg and 50 degrees of right leg straight-leg raising with back and buttock pain.  After performing Bragards, Milgrams, and Fabere tests (all positive on the left side), Dr. Blomerth diagnosed Lisi with lumbar disk syndrome, and opined that some of her pain was coming from the sacroiliac joint.

The following week, Lisi returned to Dr. Blomerth, who prescribed a regimen of physical therapy, activator-type manipulation, and ultrasound.  On April 17, Lisi returned to Dr. Blomerth complaining of continued back pain, dizziness, and vertigo.  Dr. Blomerth suspected that she had benign positional vertigo, but deferred to Dr. Goodwin as her primary care physician.

On April 22, Lisi saw Dr. Donald Stevens, a pain management specialist with Wing Memorial Hospital.  Dr. Stevens thought that Lisi exhibited signs and symptoms that were "most consistent with a left lumbar myofascial pain syndrome as the cause of her pain problem."  Dr. Stevens discovered that Lisi had trigger points in

4

her left lumbar paravertebral muscles, which, when compressed, radiated pain to her left thigh.  Dr. Stevens suggested that Lisi continue with physical therapy on her back.

After seeing Dr. Stevens, Lisi went to see Dr. Blomerth on April 27, 2009.  Lisi graded her pain as a 9.5 out of 10, and noted that Dr. Stevens refused to prescribe pain injections and Dr. Goodwin, though he had previously prescribed her pain medication, "refuses to prescribe her anymore."  Dr. Blomerth recreated Dr. Stevens' observation that compression of the lumbar spine radiated pain into Lisi's thigh.  Thus, Dr. Blomerth diagnosed Lisi with myofascial pain syndrome, and prescribed trigger point treatments, ultrasound, and deep pressure for myofascial release.

Two days later, Lisi returned to Dr. Blomerth, and noted that her pain was now an 8 out of 10, though she complained that she was sore after her trigger-point and deep pressure treatments.  Dr. Blomerth explained to Lisi that "there was not enough pressure on her low back to cause any problems in the disc; in fact, it was only musculature tension" that was causing her pain.  Dr. Blomerth noted that Lisi was "not particularly cooperative during the use of the myofascial release."

On May 21, 2009, Lisi saw Dr. Mroczka, a neurologist, who diagnosed her with "possible complex-partial seizure vs anxiety symptoms," cervicalgia, and tension headaches with possible

migraines.  However, the EEG showed no abnormalities or seizure discharges, and a thirty-day heart monitor showed sinus rhythm and no arrhythmia.  From then on, all seizure-related complaints were addressed by Lisi's mental health professionals, because the seizures were understood to be pseudoseizures caused by anxiety.

Lisi began to develop a perspective around this time that "nothing but surgery is going to work for her," though that contradicted what all of her doctors were suggesting.  Throughout May, 2009, Lisi complained of back pain during visits to Dr. Blomerth.  Eventually, he referred her to a neurosurgeon.  Lisi met with the neurosurgeon, Dr. Kamal Kalia, on July 2, 2009.  Dr. Kalia noted that Lisi had normal strength and reflexes, and no myelopathic findings.

Three weeks later, Dr. Goodwin created a treating physician report for the Massachusetts Rehabilitation Commission.  Dr. Goodwin noted that Lisi had normal reflexes and strength, and negative straight-leg raising.  He opined that Lisi was unable to drive, and "unable to sit for prolonged time, lift, pull, push, or strain due to her chronic back pain."

On August 19, 2009, Dr. Elaine Hom completed a physical residual functional capacity assessment of Lisi.  Dr. Hom thought that Lisi could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, and sit for a total of about

6 hours in an 8-hour work day.  Dr. Hom thought that Lisi was not limited in her ability to push or pull.  Dr. Homs also opined that Lisi could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Other than hazards such as machinery and heights, Dr. Hom thought that Lisi did not have any environmental limitations.  Dr. Hom noted that Lisi's allegations appeared exaggerated, and that she was only partially credible.  Finally, Dr. Hom acknowledged that Dr. Goodwin's treating source statement conflicted with her report, but dismissed Dr. Goodwin's statement as being "generic and not completely supported by the findings in the medical evidence."

On December 31, 2009, Dr. Goodwin created another treating physician report for the Massachusetts Rehabilitation Commission. In that report, Dr. Goodwin noted that Lisi's pain was the same as it was in July, and two to three times per month she could not get out of bed as a result of the pain.  When she could get out of bed, she reported being able to sit for only twenty to thirty minutes before she has to get up and move around, and could not walk substantial distances due to her lower back pain.  Dr. Goodwin opined that from an employment standpoint, Lisi was limited to driving no more than 30 minutes, and would not be able to lift, bend, pull, or push.

On January 6, 2010, Dr. Romany Girgis, a state agency physician, reviewed Lisi's updated records and agreed with Dr. Hom's August 19, 2009 assessment of Lisi's physical RFC.

### 2. Mental Impairments

Lisi also alleges that she is disabled as a result of pseudoseizures, post-traumatic stress disorder, and panic disorder.

On May 6, 2009, Lisi went to see Dr. Katrin Carlson, a psychologist at the Griswold Center in Wing Memorial Hospital, complaining of increased anxiety and depression, frequent panic attacks, and agoraphobic behaviors. Dr. Carlson performed an initial assessment, and noted that Lisi posed a minimal risk of suicide or violence, and denied substance abuse or other problematic patterns of behavior such as gambling and other addictions.

Lisi appeared well groomed, cooperative, and properly oriented. She demonstrated appropriate expressions, mood, memory, and thought content, but appeared anxious and depressed. Lisi also demonstrated fearfulness, relationship discord, social problems, worthlessness, and was tearful. She stated that she had difficulty staying asleep, was anxious, fearful, hypervigilant, and not trusting. She noted that her fears and anxieties focused mostly on concerns about her health and finances.

After evaluating Lisi's symptoms, Dr. Carlson assigned Lisi a global assessment of functioning ("GAF") score of 41. A GAF score between 41 and 50 indicates serious impairment in social, occupational, or school functioning. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) ("DSM IV"). Dr. Carlson created a plan to help Lisi deal with her depression and frequent panic attacks and avoidance behavior.

Lisi saw Dr. Carlson on May 18, 2009, and Dr. Carlson began teaching Lisi deep breathing exercises to help her control her panic attacks. At their next meeting, Lisi admitted that she had not practiced the breathing techniques as instructed.

Lisi returned on July 9, 2009, and told Dr. Carlson that she was continuing to experience panic attacks, but admitted that she was reluctant to use the breathing technique that Dr. Carlson had taught her. On July 15, 2009, Lisi told Dr. Carlson that she preferred staying at home avoiding leaving it as a result of her increased panic attacks, anxiety, and agoraphobia.

During their July 15, 2009 meeting, Dr. Carlson observed that Lisi was alert and oriented, demonstrated logical and coherent thought processes, did not have any deficits in her concentration or attention, and did not exhibit suicidal ideation or intent. Dr. Carlson also noted that Lisi was able to function at home, care for her children and manage the household responsibilities, but had limited social support outside of her

immediate family.  Dr. Carlson thought that Lisi would not require excessive supervision, and while she might have difficulty asserting herself in work situations, she was able to interact appropriately with Dr. Carlson during their meeting. Dr. Carlson assigned Lisi an improved GAF score of 45.

By July 23, 2009, Lisi reported to Dr. Carlson that she had been able to go to the grocery store without a panic attack.  She complained of frequent fainting episodes, however.

On August 11, 2009, Lisi went to see Susan Williams, a nurse functioning as a medication management specialist at the Griswold Center at Wing Memorial Hospital.  Ms. Williams performed a mental status exam, and found that Lisi was alert and oriented, but mildly anxious and slightly depressed.  Ms. Williams assigned Lisi a further improved GAF score of 50-55.  A GAF score of 51-60 indicates moderate symptoms such as flat affect and circumstantial speech or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning.  DSM IV at 32.  Ms. Williams then adjusted Lisi's medications, and set up a return visit in one month.

On August 19, 2009, Lisi reported to Dr. Carlson that she was experiencing a significant increase in stress because she was having trouble with her 16-year old daughter, and a friend had recently died.  Although she continued to experience panic attacks, she noted that she had been able to attend her friend's

10

services.  At this and a September 3, 2009 meeting, Lisi told Dr.
Carlson that the Klonopin made her feel weird, but that her
fainting spells had been reduced substantially since she began
taking it.

On August 25, 2009, Dr. Perlman, a reviewing psychologist,
completed a mental RFC for Lisi.  He thought that she was
moderately limited in her ability to understand and remember
detailed instructions, carry them out, and maintain attention and
concentration for extended periods of time.  He also thought that
Lisi would be moderately limited in her ability to complete a
normal workday without interruptions from psychologically based
symptoms, and moderately limited in her ability to get along with
coworkers or peers without distracting them or exhibiting
behavioral extremes.  In all other respects, Dr. Perlman thought
that Lisi was not limited.

Dr. Perlman also performed a Psychiatric Review Technique
for Lisi.  He found that she had mild restriction of activities
of daily living, moderate difficulty in maintaining social
functioning, and moderate difficulty maintaining concentration,
persistence, or pace.

On September 8, 2009, Lisi returned to have her medications
adjusted by Ms. Williams.  Lisi reported that she was sleeping
better, and her fainting spells had been reduced from daily to
twice per month with the addition of Klonopin.  Ms. Williams

thought that the rapid reduction in fainting spells with a low dose of Klonopin suggested that the fainting spells were in fact pseudo/seizures, and not panic attacks with fainting spells.   In response to Lisi's complaint that Celexa was not working, Ms. Williams prescribed Lisi Prozac instead.

By the end of September, Lisi reported to Dr. Carlson that her anxiety was improving, but that she had not experienced a similar improvement in her depression.

On October 21, 2009, Lisi told Ms. Williams that she felt the Prozac was helping, and she was not experiencing any side effects.   Ms. Williams thought Lisi's mood was brighter and that Lisi was calmer.   Based on some information that she had learned from Lisi, Ms. Williams hypothesized that Lisi had bipolar disorder, rather than straight major depressive disorder.

On October 30, 2009, Lisi told Dr. Carlson that her mood was stable and her anxiety had become more manageable.   Lisi had recently moved into a new home, and felt good about the change. On November 11, 2009, Lisi reported an increase in her stress level because of custody issues with two of her children, but otherwise noted that her anxiety was not as severe.   When Lisi met with Dr. Carlson on November 13, 2009, Dr. Carlson assigned her a yet further improved GAF of 61.   A GAF of 61 to 70 reflects mild symptoms such as depressed mood, or some difficulty in social, occupational, or school functioning.   DSM IV at 32.

Two weeks later, Lisi returned to Ms. Williams for further adjustments to her medications.  At that meeting, Lisi told Ms. Williams that she was experiencing fewer seizures.  She also told Ms. Williams that December was a tough month for her, traditionally, because her first husband had killed himself around the holidays.  Being proactive, Ms. Williams increased Lisi's prescriptions for Prozac and Lamictal during the holiday season.  However, Ms. Williams also assigned Lisi a GAF of 65.

In December, Lisi reported to Dr. Carlson that she was mildly depressed, though her anxiety was less noticeable and her mood was slightly improved.  She admitted to being under a number of stressors, including a custody battle for her younger daughter.

On January 21, 2010, Lisi reported to Ms. Williams that she was experiencing fewer and less intense seizures after being prescribed Lamictal, and that she was having fewer panic attacks. Ms. Williams noted that Lisi's affect was flat, and Lisi reported having nightmares with agitation and irritability once or twice per week.  Ms. Williams thought that these were symptoms of PTSD. She also noted that Lisi's memory was intact, thought it was slightly poor, and her concentration and focus had decreased when she was having seizures.  At this meeting, Ms. Williams assigned Lisi a GAF of 60.

One month later, after increasing her dose of Lamictal, Lisi reported that she was not experiencing seizures any more, and that she was generally calmer and less stressed.  Ms. Williams thought that the Seroquel she had prescribed was helping Lisi sleep better, and was calming down her bipolar traits, which Ms. Williams thought was "helping tremendously."  Ms. Williams thought that Lisi's memory, focus, and concentration had returned to within normal limits, and assigned her a GAF score of 60-65.

Dr. Carlson saw Lisi on February 8 and 10.  Lisi reported that her mood and anxiety were improving.  She noted that she was better able to handle public outings, and had less anger, though she was still not working.  Dr. Carlson assigned Lisi a GAF of 70.  During a follow-up appointment on February 25, Lisi noted that her mood was ok, and her anxiety was variable.  Dr. Carlson also saw Lisi on March 12, 2010, where she reported that her anxiety and depression were better, her irritability remained the same, but she was more willing to go outside of the home.

On April 29, 2010, Lisi returned to Ms. Williams and reported that she was generally doing pretty well.  While she still had episodes of irritability, she was able to handle them by removing herself from the situation.  Her depression was under control, and she was sleeping well at night.  Lisi wished to continue her current medications because she felt "they are very helpful."  On the same day, Lisi also saw Dr. Carlson.  She

reported that except for some frustration and anxiety she felt over her daughters, she was doing "fairly well."  Her mood was stable, she had experienced only mild irritability, and Lisi felt she was managing her mild to moderate anxiety fairly well.

In May, 2010, Dr. Carlson assigned Lisi a GAF of 70, and noted that her mood and anxiety continued to improve, and that she was experiencing fewer panic attacks (though she remained avoidant).  Dr. Carlson confirmed that Lisi was doing better in July, 2010, when Lisi reported that she went to a wedding and other social events and was able to tolerate them.  She also reported having fewer pseudoseizures, though Dr. Carlson noted that Lisi's avoidance behaviors seemed to be fairly entrenched and Lisi was having a difficult time pushing outside of her comfort zone.

Lisi returned to Ms. Williams on July 15, 2010, and reported doing well, though she was worried about her children and that she did not have control over what happens to them, especially her oldest daughter who had recently moved in with a boyfriend in Maine.  Lisi maintained her same medications, and Ms. Williams assigned her a GAF score of 65.

In August, Lisi expressed that her mood had been variable recently.  She found out that her oldest daughter, living in Maine, was now pregnant; her fiancé lost his job, putting financial pressure on her; and she continued to fight for custody

15

of her younger daughter.  On August 30, 2010, Lisi told Dr.
Carlson that she was irritable and anxious lately, and that when
she sees people doing things in public that she disapproves of,
she feels very angry.

During her October 2010 therapy sessions, Lisi reported that
she had been mildly depressed, anxious, and very irritable
recently because of relationship stresses and because she had to
meet with the attorney she hired for this case.  Nevertheless,
though he was feeling anxious, she went and met with her
attorney.

On January 1, 2011, Dr. Carlson completed a Mental
Impairment Questionnaire for Lisi.  She assigned Lisi a GAF of
61, and noted that her prognosis was fair.  Dr. Carlson described
Lisi as isolative with poor concentration, depressed mood, and
with periods of acute anxiety and increased anger.  Dr. Carlson
opined that Lisi had moderate restrictions on her activities of
daily living; moderate difficulty maintaining concentration,
persistence, or pace; and marked difficulty maintaining social
functioning.  Although Dr. Carlson could not say with certainty,
she thought that Lisi's impairments might cause her to be absent
from work about two days per month.  Dr. Carlson thought that
Lisi could manage any benefits she received on her own.

C.   Procedural History

   1.   *Application for SSDI and SSI*

Lisi filed her claim for SSDI on June 2, 2009 and her claim for SSI on June 15, 2009.  She claimed in her SSDI application that she became disabled on April 18, 2009, but claimed in her SSI application that she was disabled as of July 1, 2008.  After questioning at the ALJ's hearing, Lisi agreed that the proper onset date was April 18, 2009.  At the time when she claimed to have become disabled, she was insured.[2]

Lisi stated in her function report that she could prepare meals for her children and take care of them; wash and fold laundry as long as she didn't have to bend or lift; go outside daily; drive a car by herself; handle her finances; read and play games with her children; talk on the phone every day with her family members, and sometimes visit them in person; and go to doctors appointments and counseling on a regular basis.

Her claim was denied on August 27, 2009.  Lisi asked for reconsideration and it was again denied on January 19, 2010.  On March 5, 2010, Lisi filed a request for a hearing before an Administrative Law Judge.

---

[2]   To be eligible for SSDI, a claimant such as Lisi must show that she was insured for disability at the time she became disabled.  Under the regulations, she must show that she was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period" leading up to the quarter in which he became disabled.  20 C.F.R. § 404.130(b).

2.   *The ALJ's Hearing*

On January 10, 2011, an ALJ held a hearing at which Lisi and a vocational expert testified.

a.   Lisi

The ALJ began by asking how it was that Lisi could receive both unemployment benefits in Massachusetts, which requires that the recipient "[b]e capable of, available, and actively seeking work," Mass. Gen. Laws ch. 151A, § 24(b), and apply for SSDI and SSI, which require that she be unable to work.  Lisi became flustered, answered that Social Security had denied her disability claim, and thereafter refused to answer the ALJ's question.

After a break, the ALJ inquired about Lisi's smoking habit. Lisi testified that although her doctors had told her not to smoke cigarettes because of her physical condition, Lisi did not quit and continues to smoke.

In response to questioning from her attorney, Lisi told the ALJ that on an average night she only got three to four hours of sleep, and would have to nap every day because she was so tired. She said sometimes she was so tired, she would stay in bed all day, and that she felt that way approximately twice per month.

Lisi also testified that she experienced pseudoseizures brought on by anxiety once or twice a week lasting one to five

18

minutes.  After a seizure, Lisi reported feeling exhausted, but noted that the medications that she was on were helping.

Lisi testified that she left the house to go to appointments, but did not venture out every day.  She said she couldn't go to the grocery store because there were too many people, so her boyfriend went shopping for her.

Lisi also testified about her back pain.  She described the pain as stabbing and throbbing, running from her lower back down her left leg.  Although her doctor suggested that she get surgery, Lisi said she was not going to have it because she wasn't confident enough that it would help based on the doctor's estimate of the likelihood that the surgery would help.

Regarding her colitis, Lisi noted that she couldn't eat within two hours of appointments, because her colitis would cause her to go to the bathroom almost immediately after eating.  The ALJ asked Lisi whether any of her doctors told her to quit smoking because it was aggravating her gastrointestinal problems, and Lisi responded that they probably had.  The ALJ then asked whether he was wrong in thinking that Lisi's colitis couldn't be as severe as she suggested, if she continued to smoke despite advice from her doctor that it would make it worse.  Lisi responded "no."

Lisi testified that her children took care of the entire household, though she tried to help sometimes but it would cause

her pain.  She stated that she sometimes had difficulty concentrating, especially when coming out of a pseudoseizure or after taking her medication.

On the whole, Lisi thought she had more bad days than good in a week.  On those bad days, she said she wouldn't feel like getting out of bed, being around anyone, or answering the phone. On good days, Lisi was optimistic and wanted to do something and spend time with her kids.

     b.   Vocational Expert

The ALJ then posed a hypothetical to the vocational expert ("VE"), Mr. Dorvall.  The ALJ's hypothetical contained all of Lisi's RFC limitations that the ALJ ultimately found.[3]  The VE testified that with those restrictions, the hypothetical individual could not perform Lisi's past work.  However, the VE testified that the hypothetical individual could perform jobs like a laundry worker, assembler of small products, or production inspector.  There are 218,000 light-level laundry worker jobs nation-wide, and 4,300 in Massachusetts; 740,000 assembler of small products jobs available nation-wide, with 13,000 in Massachusetts; and 66,000 production inspector jobs available nation-wide, with 1,500 in Massachusetts.

---

[3]  The hypothetical also included a limitation on Lisi's exposure to heights or hazards, though the ALJ has omitted this from his RFC finding.

The VE also testified, however, that if the hypothetical individual missed two days per month from work, the individual would not be able to perform any jobs in the national or state-wide economies.  Likewise, if the person had a marked limitation in maintaining social functioning and would be off-task at least twenty-five percent of the work day, there would not be any jobs in the national or state-wide economies that the person could perform.

    *3.   The ALJ's Decision*

After finding that Lisi was eligible for SSDI benefits because she had been insured at the time of the alleged disability, the ALJ concluded that Lisi was not disabled within the meaning of the Act.  To reach this conclusion, the ALJ undertook the requisite five-step sequential analysis.

At step one, the ALJ found that Lisi had not engaged in substantial gainful activity since April 1, 2009.  At step two, the ALJ found that Lisi suffered from post-traumatic stress disorder, generalized anxiety disorder, depressive disorder, bipolar disorder, colitis, emotionally-based pseudoseizures, and myofascial pain syndrome/degenerative disc disease/herniated nucleus pulpose of the lumbo-sacral spine.  The ALJ classified these impairments as "severe" under the Act.

At step three, the ALJ found that Lisi did not have an impairment or combination of impairments that met or was

equivalent to one of the listed impairments in the regulations. The ALJ found that the record failed to establish that Lisi's mental impairments caused at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation as defined in the regulations, thus Lisi's mental impairments were not medically equivalent to those listed in the regulations.

At step four, the ALJ found that Lisi had the RFC to perform light work except that she would require a sit/stand option at her discretion to account for her back impairment, pseudoseizures, and colitis; and the job would have to be isolated from the public, have only occasional interaction with others, and be unskilled, to account for her mental impairments.

At step five, the ALJ found that Lisi would be unable to perform her past relevant work. However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Lisi could perform. In making this determination, the ALJ evaluated Lisi's age, RFC, education, work experience, and the testimony of the VE. Accordingly, the ALJ found that Lisi was not disabled and that decision became the decisoin of he Commissioner.

## II.   STATUTORY FRAMEWORK

A.   Standard of Review of an ALJ's Decision

The Social Security Act authorizes judicial review of social security disability determinations.  42 U.S.C. § 405(g).  A

reviewing court is authorized to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The factual findings of the Commissioner must be treated as conclusive if "supported by substantial evidence." *Id.* Review is "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Evidence is not insufficient under this standard merely because contradictory evidence exists in the record. *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

B.   Standard for Entitlement to SSDI and SSI Benefits

The underlying issue before me is whether Lisi is "disabled" for purposes of the Social Security Act and is therefore eligible for SSDI and SSI benefits.  A "disability" is defined by the Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A) (defining

23

disability for SSDI); 42 U.S.C. § 1381c(a)(3)(A) (defining disability for SSI).

An individual may only be considered disabled for purposes of receiving benefits if her impairment is "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) (SSDI); 42 U.S.C. § 1381c (a)(3)(B) (SSI).

Under the relevant regulations, the Commissioner evaluates an individual's claim of disability under a five-step analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a).  If the Commissioner determines that the claimant fails any of the five steps, he can find that the claimant is not disabled under the Act and need not continue the sequential analysis.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

Under the first step, a claimant is not considered disabled if she is engaged in "substantial gainful activity."  *Id.*

Under the second step, if the claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that [are] severe and meets the duration requirement" the individual is not considered disabled.  *Id.*

Under the third step, if a claimant's impairment meets or is equivalent to one specifically listed in the regulations and meets the duration requirement, the individual is deemed disabled. *Id.*

At the fourth step, the claimant's residual functional capacity is determined, and if, given this determination, the claimant is capable of performing her past relevant work, she is not considered disabled. *Id.*

If at step four the claimant shows that she is unable to perform past relevant work, then at step five, in order to find the claimant not disabled, the Commissioner must come forward with evidence of the existence of specific jobs in the national economy that the claimant would be able to perform. *See Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001).

The fifth step considers the claimant's residual functional capacity ("RFC") as well as age, education, and work experience to determine whether the claimant can make an adjustment to other work.  If an adjustment can be made, the claimant is not considered disabled.  20 C.F.R. § 404.1520, 416.920.

### III.  DISCUSSION

Lisi claims that the ALJ made two errors in evaluating her claim, and therefore that his denial of SSDI and SSI should be reversed or remanded for further consideration.  First, Lisi claims that the ALJ erred by giving insufficient weight to Dr.

25

Carlson's treating source statement.  Second, Lisi claims that
the ALJ's conclusion as to her physical limitations in the RFC
was not supported by substantial evidence.

A.   Insufficient Weight to Dr. Carlson

First, Lisi claims that the ALJ gave insufficient weight to
portions of Dr. Carlson's treating source statement.  The ALJ
gave great weight to Dr. Carlson's observations, but declined to
give Dr. Carlson's opinion controlling weight because it was
internally inconsistent.

At the outset, I note that under First Circuit law, the ALJ
was not required to give greater weight to Dr. Carlson's opinion
simply because she was Lisi's treating psychiatrist.  *Arroyo v.
Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)
(per curiam).  Indeed, the Social Security Administration has
ruled that to do so is error if the treating source's opinion "is
inconsistent with the other substantial evidence in the case
record."  Soc. Sec. Ruling 96-2p.

When an ALJ decides not to give a treating physician's
opinion controlling weight because it is inconsistent with other
substantial evidence in the record, the ALJ must nevertheless
weigh the opinion based on a number of factors listed in the
regulations.  20 C.F.R. § 404.1527(d).  Those factors include (1)
the length of the treatment relationship and the frequency of
examination; (2) the nature and extent of the treatment

relationship; (3) the medical evidence supporting the opinion; (4) the opinion's consistency with the record as a whole; (5) the physician's specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d).  Generally speaking, a treating physician's opinion will be entitled to more weight than a consulting physician's opinion.  *See* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ was entitled to give some portions of Dr. Carlson's opinion great weight while finding that other portions were inconsistent with the record as a whole and thus worthy of less weight.  The evidence showed that at the onset of her disability, Lisi was substantially burdened by her anxiety, depression, and pseudoseizures, as reflected by Dr. Carlson's initial GAF assessment of 41.  However, from August 2009 until 2011, Lisi's treatment records showed that she was experiencing substantial improvement, with occasional minor setbacks during times of particular stress or traumatic events.  Dr. Carlson and Ms. Williams described Lisi's mood as improved, her anxiety and depression reduced, her pseudoseizures substantially reduced, and her ability to function as improving with medication and time.

The majority of the evidence in the record was consistent, and it showed that Lisi's symptoms were, on the whole, improving with medication and treatment, and the symptoms that were not improving were not debilitating such that Lisi could not perform

jobs available in the local and national economies.  Dr. Carlson's assessment in her January 2011 report checked the box saying that Lisi's had recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week.  However, that was inconsistent with substantial evidence in the record that Lisi's panic attacks were improving.  Thus, to the extent that the ALJ disagreed with Dr. Carlson's opinion, he gave it less weight.

Taken as a whole, however, neither Dr. Carlson nor Ms. Williams opined that Lisi could not work with the restrictions and accommodations that the ALJ ultimately found appropriate. Neither of their opinions provide support for Lisi's contention that by giving Dr. Carlson's treating source statements controlling weight, she would be found disabled.

B.   Insubstantial Evidence for Physical Findings

Second, Lisi claims that the ALJ selectively summarized the evidence in the record of her physical problems to support his conclusion that she was not disabled.  The First Circuit has made it clear that the question for review is only whether substantial evidence supported the Commissioner's decision.  If it did, then it is irrelevant that substantial evidence also could have supported the claimant's view.  *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) ("Although

other medical evidence in the record conflicted with Dr. Medina's conclusions, the resolution of such conflicts in the evidence is for the Secretary.  We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.").

Here, the ALJ properly gave Dr. Goodwin's opinion less weight because it conflicted with substantial evidence in the record.  Other than Dr. Goodwin, no doctor or other professional opined that Lisi's back problems and colitis would prevent her from light or sedentary sit-stand work.  Dr. Goodwin did not write down any of Lisi's physical restrictions in his casefile notes for her.  Dr. Hom and Dr Girgis both reviewed Lisi's files and concluded that Lisi could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour work day.  They thought that Lisi was not limited in her ability to push or pull, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. This conflicted with Dr. Goodwin's report that Lisi was limited to driving no more than 30 minutes, would not be able to lift, bend, pull, or push, and could not sit for more than twenty to thirty minutes.

The record made clear that Lisi's pseudoseizures were effectively controlled by medication, and in any event the

hypothetical RFC that the ALJ proposed to the VE contained a restriction that the individual could not be exposed to heights or hazards, though the ALJ omitted that restriction from his RFC findings (possibly erroneously).  Thus, the VE testified that a sufficient number of jobs existed in the local and national economies even taking into account Lisi's pseudoseizures.

As to Lisi's colitis, nothing in the record suggests that it restricted Lisi's ability to work, and not a single doctor opined that Lisi would need additional breaks to accommodate it. Indeed, Lisi herself seemed to admit during questioning that her colitis was not as severe as she had made it out to be.[4]

-------

[4]  The ALJ asked Lisi a number of questions at the hearing that suggested that Lisi did not believe her colitis was severe:

> Q:   Have any doctors told you that your continued smoking aggravates your gastrointestinal problems, ma'am?
> A:   I don't recall, I don't remember, but I'm sure they probably did, yes.
>
> . . .
>
> Q:   Well, can I assume from the fact that you continue to smoke despite that it's making your gastrointestinal problems worse, that maybe they're not as severe as you say?  See, here's what I'm confused about.  I don't understand why a person would continue to engage in a habit that a doctor tells them is dangerous to them and then say that the problem is that severe.  My logical conclusion is maybe the problem is not as bad as you say.  Am I wrong in thinking that?
> A.   No.

Therefore, the ALJ did not err in giving more weight to the other evidence in the record that suggested Lisi could perform light to sedentary work, and less weight to opinions that conflicted with substantial evidence in the record.  *See Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) ("[T]he resolution of conflicts in the evidence is for the [Commissioner], not the courts.").

## IV.  CONCLUSION

For the reason set forth above, I AFFIRM the Commissioner's decision.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE